**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br>VICKY L ECKERDT,<br>                     Debtor.<br>KAREN EMERICK,<br>                     Plaintiff,<br>v.<br>VICKY L ECKERDT,<br>                     Defendant. | Chapter 7<br><br>No. 4:11-bk-22845-JMM<br><br>Adversary No. 4:11-ap-02147-JMM<br><br>**MEMORANDUM DECISION** |

A trial in this action came on for hearing on October 9-10, 2012. The complaint alleged that there existed a debt owed to Plaintiff which should be declared non-dischargeable on grounds of fraud (11 U.S.C. § 523(a)(2)).[1]

**<u>JURISDICTION</u>**

This court has jurisdiction over this core matter. 28 U.S.C. §§ 157(b)(2)(I) and (J).

---

[1] At trial, counsel for Plaintiff acknowledged that Plaintiff was proceeding only on the § 523(a)(2) count. <u>See, also</u>, Joint Pretrial Statement at 9, lines 15-16.

## NATURE OF THE ACTION

This case concerns a sale of a condominium unit, which closed on January 2, 2008. Plaintiff Karen Emerick maintains that Defendant Vicky Eckerdt knew of construction defects affecting not only the condominium which she purchased, but also that any such defects were also applicable to the entire 73-unit complex.

Ms. Emerick contends that Ms. Eckerdt knew of such facts, and withheld such knowledge during the negotiations leading up to the ultimate sale. Ms. Emerick seeks damages for fraud.

Ms. Eckerdt denies having such knowledge and asks that her bankruptcy discharge be protected from these assertions.

## FACTS

### A. Ownership of Unit 127

On or around April 12, 2005, Vicky Eckerdt and Penny Webb purchased the condominium located at 537 South Delaware Drive, Unit 127, Apache Junction, Arizona (the "Condominium" or "Unit 127"), located within the Mountain Vista Villas condominium development. They paid $93,175 for the property (Ex. 1).

Ms. Eckerdt and Ms. Webb purchased the Condominium as an investment and allowed Ms. Eckerdt's children to live there. Ms. Eckerdt's children are Jessica Eckerdt and James Eckerdt.

On or about the same date, Ms. Eckerdt and Ms. Webb also purchased Unit 126 as an investment and allowed Ms. Eckerdt's mother to live there.

Neither Ms. Eckerdt nor Ms. Webb ever lived in Units 126 or 127. They resided off of the condominium complex.

Unit 126 was sold in September 2006.

The entire Mountain Vista Villas condominium complex, including the Condominium, was managed by Rossmar & Graham.

Within the first year of ownership of the Condominium, Ms. Eckerdt's children notified her that the home required various repairs. Those repairs included: cracked tiles in the kitchen and one in the living room, the garbage disposal, a knob to receive hot water in the master bathroom, a small crack in the wall around the frame of the window in the master bedroom, cracks in the stucco around the patio, a drawer in the kitchen and the dishwasher.

Upon learning of a necessary repair, Ms. Eckerdt would fax the builder, Spectre West, about the necessary repair, and Spectre West would send someone to the Condominium to repair the item.

Ms. Eckerdt's children also told Ms. Eckerdt about repairs to minor exterior stucco cracks within the surrounding condo buildings near the Condominium.

### B. Unit 127 Is Put Up for Sale

On or about October 20, 2007, Ms. Eckerdt and Ms. Webb decided to sell Unit 127, as both of Ms. Eckerdt's children no longer resided there, and Ms. Eckerdt and Ms. Webb had been continuously living elsewhere.

Ms. Eckerdt and Ms. Webb hired real estate agent Jennifer Kennard to list the Condominium for sale. Ms. Eckerdt had known Ms. Kennard for approximately two months at that time.

Ms. Kennard had received her real estate license only a few months before listing the Condominium.

Ms. Kennard listed the Condominium for sale on October 20, 2007 (Ex. 18, 45). The listing price was $125,000.

Ms. Emerick, who had viewed Unit 127, offered to purchase the Condominium on November 24, 2007 (Ex. B), and after brief negotiations involving a counter offer, the parties came to an agreement.

## C. Inspections and Disclosures

After the agreement for sale was signed, Ms. Eckerdt delivered a disclosure notification to Ms. Emerick, wherein she noted any items that she felt were important and material facts about the property (Ex. 11).

At about the same time, on November 29, 2007, Ms. Eckerdt hired King Inspection Services to inspect the premises and advise her of any items that were significant to the structural or cosmetic integrity of the unit. At the conclusion of his report, Mr. King noted three items:

- Waste clean out behind dryer has leaked
- Grout needed at family room tile floor.
- Grout needed at tile floor next to hall bathtub

(Ex. D.) This inspection lead Ms. Emerick to request the sellers to:

1. Treat for termites and deliver clean termite report;
2. Replace three cracked tiles in kitchen area; and
3. Regrout the tile lines where cracked from the kitchen to the front door and around the tub in the front bathroom and behind the toilet.

(Ex. C). Ms. Eckerdt and Ms. Webb agreed to these repairs (Ex. C), and no evidence was presented that they did not do so.

The Seller's Property Disclosure Statement ("SPDS") provided by Ms. Eckerdt disclosed affirmatively that the property had been treated for termites in 2005 (although it may have been coincident to the condo above Unit 127 needing treatment). No other significant issues were noted in the SPDS (Ex. 11). Any tile repair and termite inspections were discussed between Ms. Eckerdt and the real estate agent, Ms. Kennard, prior to closing (Ex. 14, 16).

### D. Sale Closes

The sale closed on January 2, 2008, at the purchase price of $117,500 (Ex. 20, 22, 25, 26). Ms. Emerick put down cash of $30,645.94, and obtained financing for the balance in the amount of $87,500 (Ex. 21, 22, 23, 24).

### E. Construction Defects

The essence of Ms. Emerick's contentions revolve not around minor items (which will be discussed later), but around major and significant construction defects which were manifest throughout the entire condominium complex. She contends that Ms. Eckerdt knew of these significant issues, and failed to disclose them.

To support her theory, Ms. Emerick relies upon a series of either open meetings or board-only meetings of the Mountain Vista Villas homeowners' association. Each will be discussed in turn.

**May 19, 2007**. An annual meeting was held at which only two homeowners attended. Ms. Eckerdt testified that she never attended any of the open meetings, and the minutes do not reflect her attendance. Apparently, at that meeting, one or more of the homeowners discussed "developer issues regarding repairs of common elements (roof, window sills)." Nothing further is noted in the minutes, nor was there testimony that these minutes were distributed to Ms. Eckerdt (Ex. 3), nor that she was aware of its contents.

**July 7, 2007**. At a Board of Directors open meeting, there was a presentation and discussion about whether to engage an attorney for construction defects litigation. This item, however, was tabled. Only five unit homeowners (besides the board) were present. Neither Ms. Eckerdt nor Ms. Webb was among them. The minutes do not indicate their dissemination

to the entire community. Nor was there any other testimony or evidence that Ms. Eckerdt was aware of what had transpired at this meeting (Ex. 4).

**August 4, 2007**. The Board of Directors met in Executive Session, and no homeowner was in attendance. At this meeting, any resolution of whether to hire litigation counsel was tabled. Instead, the board asked the management company to seek input from all unit owners as to any construction concerns (Ex. 5).

On August 22, 2007, the association's management company sent a letter to all homeowners which read, in pertinent part:

> Common Area or Unit Issues. If you have a condition in your unit that is causing issues (Leaking (sic) windows, plumbing, water, etc.), Please (sic) report to the Management company immediately. The Association is taking steps to correct the issues left by the developer.

(Ex. 6.) This letter was sent to Ms. Eckerdt at the property's address, and not to where she and Ms. Webb were actually living. Ms. Eckerdt's testimony was that she never saw the letter. Even if she had, the letter did not discuss "litigation," but appeared only to seek input for matters to be discussed with the developer. In addition, the items specifically mentioned--"Leaking windows, plumbing, water, etc."--are not contained in the list of problems articulated by Ms. Emerick.

This evidence, standing alone, is not enough to impart the knowledge of substantial construction defects or litigation about the issue to Ms. Eckerdt.

**September 1, 2007.** At a closed meeting, the board discussed the hiring of a construction defects attorney, John Chaix. In addition, the board was to "forward to homeowners, by word-of-mouth, regarding possible infestation of termites."

No evidence was presented to show that Ms. Eckerdt received any communication, by word-of-mouth or otherwise, of the contents of what occurred at this closed meeting (Ex. 7).

**September 1, 2007**. The same day, an open meeting of the board took place. Four unit homeowners were present, none of whom were Ms. Eckerdt or Ms. Webb. At that meeting, attorney John Chaix gave a "presentation" on "construction defect options." (Ex. 8.)

No evidence was presented to show that Ms. Eckerdt or Ms. Webb were aware of the contents of the September 1 meetings.

**October 6, 2007**. The board met in closed session, and approved the hiring of John Chaix as the association's construction defects attorney (Ex. 10).

No evidence was presented that Ms. Eckerdt or Ms. Webb knew of this action.

> On October 18, 2007, Ms. Eckerdt and Ms. Webb signed the SPDS (Ex. 11). It contains no mention of anything related to any knowledge of construction defects.

**November 17, 2007**. At an open meeting attended only by the board and two homeowners (neither of whom were Ms. Eckerdt or Ms. Webb), attorney Chaix gave a status report on his communications with the developer, Spectre West (Ex. 13).

No evidence was given which showed that Ms. Eckerdt or Ms. Webb had any knowledge of the substance of that meeting.

**December 1, 2007**. At an open board meeting attended only by a single homeowner (not Ms. Eckerdt or Ms. Webb), the board corrected its November 17 minutes to add: "John Chaix to prepare a draft to present to the board for approval to be sent to the homeowners stating the developer's stance on the construction defect issues." (Ex. 17).

No evidence was presented to show that Ms. Eckerdt or Ms. Webb had any knowledge of this meeting or of its contents.

**December 6, 2007**.  At a special meeting of the board, at which no homeowners were present, attorney John Chaix focused on roof repairs of $100 or under, which interestingly were to be repaired "at the expense of the law offices of John Chaix" and to be later reimbursed under certain conditions (Ex. 19).

Again, nothing was presented to reflect that Ms. Eckerdt or Ms. Webb had any knowledge of what occurred at that meeting.

### F.  Post-Closing Events

#### 1. In General

Although Ms. Eckerdt sold Unit 127 to Ms. Emerick on January 2, 2008, the issues involving construction defect litigation began to heat up in the months following.

In late September, 2008, almost nine months after the Eckerdt/Emerick closing, several reports were generated which detailed Spectre West's construction/warranty responsibility. (See Ex. 36, 37, 28.)  In April, 2008, 15 months post-closing, a repair estimate was generated by Nautilus, a general contractor, estimating the association's repair costs at $3,624,601.09 (Ex. 39).

Eventually, the association filed suit against Spectre West, and obtained a judgment for $2,398,185.81 (Ex. 30, 43).  That judgment was entered on August 5, 2009 (Ex. 43).

#### 2. Emerick Unit 127- Notice to Eckerdt

About two weeks after the closing, Ms. Eckerdt received a January 14, 2008 letter from attorney Chaix' office, at her post office box, concerning his retention to investigate "water leaks into the units" and "water intrusion," and asked homeowners to report "all instances of on-going leaks to this office . . . ."  (Ex. 28.)

In response, Ms. Eckerdt notified Mr. Chaix' office that she no longer owned the condo.

Another letter from Mr. Chaix' firm, dated January 30, 2008 was also received by Ms. Eckerdt, who again contacted Mr. Chaix' office and advised that she no longer owned the unit (Ex. 29).

Ms. Eckerdt testified that these post-closing communications were the first time she was made aware of any major construction issues. In view of the totality of the evidentiary record, Ms. Eckerdt's testimony is credible. This credibility issue is bolstered by Plaintiff's lack of any direct evidence to contradict this critical knowledge issue.

All that Plaintiff has presented in response to Ms. Eckerdt's denial of actual knowledge was to point out that Ms. Eckerdt had, on a single occasion, groomed one of the association's board member's cats. Plaintiff's assertion that Ms. Eckerdt and the board member had therefore had in-depth conversations about the state of the Mountain Vista Villas' construction problems was too speculative, inferentially unreachable by a court as a matter of circumstantial evidence. This lack of probable proof could, perhaps, have been assisted by direct testimony from the board member herself, but she was not called. Ms. Eckerdt, on the other hand, testified that he never had a discussion with the board member on this important topic. The evidence does not indicate, in any manner, that Ms. Eckerdt and Ms. Webb withheld material information about possible construction defects or litigation, when they filled out and signed the SPDS (Ex. 11) on October 18, 2007.

### G.  Emerick's State Court Lawsuit Against Eckerdt

Sometime in 2009, Ms. Emerick sued Ms. Eckerdt and Ms. Webb, as well as their real estate agents, in state court. She sought alternative remedies, including rescission and damages. Ms. Emerick and Ms. Webb answered, denying the allegations, and the matter proceeded to the discovery stage.

The matter never reached trial or judgment in the Superior Court. Ms. Eckerdt filed a Chapter 7 petition on August 20, 2011, and Ms. Webb filed a Chapter 13 petition on March 22, 2011.

From that point forward, matters have progressed exclusively in the bankruptcy court.

## MS. EMERICK'S MINOR GRIEVANCES

Ms. Emerick's case in this court also seeks damages for other misrepresentations which she contends were known to Ms. Eckerdt, not disclosed in the SPDS (Ex. 11) and which were otherwise concealed from her. Each item requires discussion.

### 1. Tile Cracks, Grout Failure

Ms. Emerick complained of these items, after they were brought to her attention by her home inspection (Ex. D). Ms. Emerick requested repair of those items (Ex. C), and they were repaired prior to closing. She complains that tiles had been previously cracked and had to be replaced, separate from those disclosed, and should have been on the SPDS. Indeed, such may have occurred (see Interrogatory No. 1, Ex. 54), but this court finds that "a few" cracked and replaced tiles were not such a material item for disclosure that now cries out for damages for fraud. Even if they were, Ms. Emerick presented no evidence as to what the damage figure would be to replace only a few more tiles. That there were only a few more is reflected by Ms. Emerick's Ex. 40-A, 40-E and 40-F. These were small and insignificant items, certainly not rising to the level of a fraud claim. In addition, the photos in Ex. 40 were taken 15 months after closing, and there was nothing shown by the evidence which would link those cracks to anything that occurred pre-closing.

### 2. Termites

Ms. Emerick also maintains that the condo had termites. The extent of any damage, however, was never explained nor quantified. The existence of termites had been revealed on Ex. C, when Ms. Emerick requested that a "clean termite report" be delivered prior to closing.

(Ex. C). Moreover, the SPDS (Ex. 11) disclosed an earlier 2005 treatment, which Ms. Eckerdt testified was due to termites in the unit above No. 127 (Ex. 11, item 81).

Because Ms. Emerick was aware of prior (and perhaps existing) termite issues prior to closing, and due to her request for a "clean termite report," she has waived any argument that she was somehow misled by any inaccuracies in the SPDS. She was on full notice at that point. If she was dissatisfied, she could have walked away from the contract.

### 3. Microwave

The microwave was represented by Ms. Eckerdt to be in working order. (See SPDS, Ex. 11 at item 144). But Ms. Emerick complains that it turned off after 30 seconds of power, post-closing. However, as of the closing walk-through, Ms. Emerick checked "yes" to the working order of the microwave. (Ex. E).

In reviewing the entire record, the court found nothing to infer that this defect was known by Ms. Eckerdt--and omitted from disclosure. Moreover, Ms. Emerick had a remedy, in that the Purchase Contract provided that sellers would purchase a $500 home warranty plan for Ms. Emerick for appliances. (Ex. B at lines 257-262.) They did so, at a cost of $390 (Ex. 22 at line 1304). All Ms. Emerick had to do was look to that plan for recourse. There was no evidence that she did so.

No fraud was proven by Ms. Emerick.

### 4. Chipping Stucco

A "couple of months" after closing, Ms. Emerick noted that "large chunks" of stucco began chipping off. No photos of those items were provided, nor was any report submitted on Unit 127, so the court has no way of knowing the extent of this issue.

Ms. Emerick failed to prove, by a preponderance of the evidence, that this was a material issue. Also, by testifying that this occurred a "couple of months" after closing does not

establish that the sellers knew beforehand of any material issues in the stucco, which they were required to point out in the SPDS (Ex. 11).

As for Ms. Eckerdt's knowledge of stucco issues, the knowledge was limited to "a few cracks" which were repaired in 2007. (Ex. 54, Interrogatory Answer to no. 1, at 2-3.)

At the time she signed the SPDS, Ms. Eckerdt properly noted that she was not aware of any "cracks . . . involving the . . . exterior walls." (Ex. 11 at item 67.)

The omission of the 2007 repair of a "few cracks" was not material.

### 5. Window Sill Cracks

Ms. Emerick was not very specific on this item. The sellers, in later interrogatories, mentioned that there had been a "small crack in the wall around the frame of the window," which had been filled. (Ex. 54, Interrogatory Answer no. 1.)

This item was not material to the overall sale transaction.

### 6. Dryer

Ms. Emerick testified that the dryer was "destroying" clothes." As in the case of the microwave, there was a home warranty plan which Ms. Emerick could use to rectify that problem. Whether she ever made a claim under the house warranty plan never came up in testimony.

No fraud existed as to this item by Ms. Eckerdt.

### 7. Conclusion--Minor Items

The tile cracks and grout failure were brought to Ms. Emerick's attention prior to the sale, but she closed anyway. She therefore waived her claim that she was somehow defrauded by these minor items.

The same can be said for any alleged termite issues.

Problems with the microwave and dryer, if they were truly issues of concern, were--or should have been--remedied by recourse to the home warranty plan, which was purchased by the sellers at a cost of $390 (Ex. 22 at line 1304). This plan was exclusively for Ms. Emerick's protection.

The window sill crack(s) were minor, and previous cracks had been filled. This was not a material item. Nor did Ms. Emerick prove even a single dollar of damages related to this issue.

Finally, the "chipping stucco" argument failed for reasons that its extent was unproven. There were no photographs, reports or testimony detailing the extent of any problems as to Unit 127. (See, e.g., Ex. 37, p. 33-36.)[2] This was too minor to be considered a material fraud.

## **COURT'S ANSWERS TO PLAINTIFF'S CONTESTED ISSUES OF LAW**

In the Joint Pretrial Statement, Plaintiff listed four questions for the court to answer, concerning her theory of the case. The court therefore does so, as follows:

| Question | Court Answer |
| --- | --- |
| 1. Whether Ms. Eckerdt obtained money from the sale of the Condominium by false pretenses, a false representation or actual fraud in violation of 11 U.S.C. § 523(a)(2)(A). | No |
| 2. Whether the problems Ms. Eckerdt experienced in the home were minor repair items or manifestations of construction defects. | Minor, inconsequential or immaterial |
| 3. Whether Ms. Eckerdt knew of, and intentionally failed to disclose, manifestations of construction | No |

---

[2] Even in the April 8, 2009, $3,624,601.09 repair estimate, plaster issues totaled only $4,071.44, an average of only $55.77 per unit. (Ex. 39.) This was minor and immaterial.

| | |
|---|---|
| defaults with the sale of the Condominium. | |
| 4. Whether Ms. Eckerdt knew about, and intentionally failed to disclose, a construction defect investigation performed by the HOA. | No |

## THE LAW

### Section 523(a)(2)--Money or Property Obtained
### by False Pretenses, Fraud or Misrepresentation

Plaintiff contends that Defendant defrauded her and obtained her money by misrepresentation, false pretenses or actual fraud. 11 U.S.C. § 523(a)(2).

Section 523(a)(2)(A) provides that:

(a) A discharge ... does not discharge an individual debtor from any debt-

\* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

In the Ninth Circuit, in order to establish that a debt is non-dischargeable under § 523(a)(2)(A), a creditor must establish five elements:

A. misrepresentation, fraudulent omission or deceptive conduct by the debtor;

B. knowledge of the falsity or deceptiveness of her statement or conduct;

C. an intent to deceive;

D.   justifiable reliance by the creditor on the debtor's statement or conduct; and

E.   damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

In re Slyman, 234 F.3d 1081, 1085 (9th Cir. 2000). These elements must be proven by a preponderance of the evidence. In re Sabban, 600 F.3d 1219, 1222 (9th Cir. 2010); Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654 (1991).

Whether the debt arises from fraud is the only consideration material to non-dischargeability. Consequently, whether or not the debtor received a benefit from the fraud is not a required element of proof. Muegler v. Bening, 413 F.3d 980, 983-84 (9th Cir. 2005) (citing Cohen v. de la Cruz, 523 U.S. 213, 223, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998)).

A creditor must show that she justifiably relied on the debtor's representations. Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 438, 133 L.Ed2d 351(1995).

"False pretenses" involves "an implied misrepresentation of conduct intended to create and foster a false impression." In re Demarest, 176 B.R. 917, 920 (Bankr. W.D. Wash. 1995) (citation omitted), aff'd mem., 124 F.3d 211 (9th Cir. 1997).

## **CONCLUSION**

Based upon the law and the evidence, the court FINDS AND CONCLUDES that Plaintiff failed to prove a case of a non-dischargeable act by a preponderance of the evidence.

Accordingly, judgment will be entered in favor of the Defendant, and dismissing Plaintiff's complaint against her. Similarly, as for Ms. Emerick's Proof of Claim, the court finds no reason to find that either Ms. Eckerdt or Ms. Webb owe her any money for breach of contract. Each side is to bear their own costs.

DATED AND SIGNED ABOVE.

To be NOTICED by the BNC ("Bankruptcy Noticing Center") to all parties to this adversary proceeding